[Cite as *Univ. of Toledo v. Am. Assn. Univ. Professors*, 2025-Ohio-3008.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

The University of Toledo                    Court of Appeals No.  L-24-1221

      Appellee                               Trial Court No.  CI-24-1331

v.

American Association of the              **DECISION AND JUDGMENT**
University Professors, et al.

      Appellants                             Decided: August 22, 2025

* * * * *

Sarah Skow and David Smigelski, for appellee.

Erik Chappell, Julie Douglas, J. Connor Dunn, and Jonathan Winters, for
appellants.

* * * * *

**MAYLE, J.**

{¶ 1} Appellants, the American Association of University Professors, Toledo

Chapter, and Bradley Pierson, appeal the September 3, 2024 judgment of the Lucas

County Court of Common Pleas denying their application to confirm an arbitration award

reinstating Pierson to his position as a tenure-track professor, and granting the application

to vacate, modify, or correct the arbitration award filed by appellee, the University of

Toledo. Because the trial court exceeded the scope of review permitted by R.C. Ch. 2711, we reverse.

## I. Background and Facts

{¶ 2} This case arose from UT disciplining Pierson, a tenure-track music professor, based on his relationship with an undergraduate student, which consisted of in-person contact and numerous messages sent by text and through social media platforms.[1] The relationship came to light when the student spoke to Katherine Abu-Absi, an outreach and retention specialist at UT, about an issue she was having with a professor, whom the student did not name. At the end of the meeting the student told Abu-Absi that she would address the issue directly with the professor.

### A. Title IX proceedings

{¶ 3} Several days after their meeting, Abu-Absi sent the student an email acknowledging that the student "REALLY d[id]n't want to disclose the name of the Professor . . . [,]" but pressing her "to be very brave and let us know, is it Brad Pierson[.]" Abu-Absi told the student that "[w]e will help you with tuition, we will get you placed in a student teaching assignment asap, and we will be with you during every step of your last year at UToledo and we will help you find a dream job."

{¶ 4} Less than an hour after sending this email—and before the student confirmed or denied that Pierson was the professor—Abu-Absi filed a Title IX complaint alleging that the student told her (1) a professor had texted her every day over the

---

[1] The details of Pierson's conduct are largely immaterial for our purposes. We address them only as necessary.

2.

summer, sometimes at 3:00 a.m., including messages about him worrying about crossing a line with the student and looking forward to the student graduating so their friendship could grow; (2) the professor told the student that she was not ready to student teach in the fall and had to do an independent study course with him, which delayed her graduation and caused her to worry about the extra tuition; (3) the student "has been put in a room alone with [the professor] and she's very concerned that he will try and push things into physical sexual contact"; (4) although the student did not provide the professor's name, Abu-Absi looked up her schedule and saw that she had an independent study course with Pierson; and (5) Abu-Absi had emailed the student to ask if the professor was Pierson, but had not heard back.

{¶ 5} The university investigated the Title IX complaint. After interviewing the student, Pierson, and Abu-Absi, the investigators issued their report, which (1) summarized the information that they had learned, including that Pierson had sent the student over 1,000 messages during a nine-month period, requested pictures of the student and her apartment, and discussed topics like weight and dating; (2) found that the student's testimony was "plausible, consistent, and corroborated by" Abu-Absi's testimony; (3) found that Pierson's testimony "was not inherently plausible" because his statements directly conflicted with evidence that the student provided, his responses were vague, and his responses to the messages that they showed him "further hurt his credibility"; (4) determined that "[t]he instant message communications between a faculty member and student pertaining to topics outside of the scope of [the student's] education are concerning" and that the messages had gotten "progressively more casual

3.

and intimate, and less professional"; (5) claimed that Pierson did not explain how such messages enhanced his ability to teach the student; and (6) concluded that, despite a few "pleasant interactions" between Pierson and the student, "the totality of the circumstances support that [Pierson's] actions made [the student] uncomfortable and were unwelcome." The Title IX office referred the matter to the office of faculty labor relations for further handling.

## B. Discipline and grievance

{¶ 6} As a result of the Title IX investigation and report, UT charged Pierson with four policy violations:

> 1. Sexual misconduct, including unwelcome conduct of a sexual nature, creating a hostile environment, in violation of University Policy 3364-50-01: *The University of Toledo Title IX Policy;*
>
> 2. Inappropriate conduct, including conduct that is unprofessional in interactions with a student, including sharing with a student confidential conversations with the Dean, requesting a student send you photos of oneself and their apartment, offering to drive a student to a conference and encouraging them not to share that information, and failure to maintain appropriate boundaries with a student, in violation of University Policy, 3364-25-01: *Standards of Conduct;*
>
> 3. Failure to adhere to your proper role as an intellectual guide and counselor to a student, including, but not limited to repeatedly contacting a student to discuss non-academic related matters, soliciting personal information from a student including requesting photographs of the student and their apartment, and discussing the student's weight, in violation of [section] 5.2.2 of the *Collective Bargaining Agreement.*
>
> 4. Failure to avoid harassment of a student enrolled in one of your courses, including, but not limited to sending over 1,000 text messages to a student in the period of approximately 9-months, many of which were not academic related, requesting a student discuss personal information about dating and their weight, requesting a student send photos of herself and her

4.

apartment and following-up on those requests when not initially met, in violation of [section] 5.2.2 of the *Collective Bargaining Agreement.*

{¶ 7} Following a predisciplinary hearing—which neither Pierson, his attorney, nor a union representative attended because UT refused to reschedule it—UT decided to terminate Pierson's employment. In its report from the predisciplinary hearing, UT found, based on the student's testimony at the hearing and information in the Title IX report, that Pierson had committed all four charged violations.

## C. Arbitration

{¶ 8} AAUP filed a grievance seeking to have Pierson reinstated, which went to arbitration, as provided for by the terms of the CBA. The parties agreed that the arbitrator would decide "[w]as [Pierson's] employment terminated for just cause? If not, what is the remedy?"

{¶ 9} After seven days of hearings, the arbitrator issued a 119-page decision and award reinstating Pierson's employment but suspending him without pay for 20 days. The arbitrator found that UT lacked just cause for terminating Pierson's employment but had just cause to discipline him for sharing confidential administrative information with a student.

{¶ 10} In his report, the arbitrator concluded that Pierson did not engage in unwelcome conduct of a sexual nature because (1) he did not send the student anything explicitly sexual; (2) the innuendo in some of the messages that he sent could be interpreted as either innocent or lascivious; (3) the conversation the two had about weight discussed both the student's and Pierson's weight; (4) Pierson did not "request" that the

5.

student discuss dating with him, as UT alleged; and (5) the messages showed that Pierson's requests for photos of the student and video of her apartment might have been "annoying," "ill-mannered," or "presumptuous," but were "short of the exploitation proscribed by [the CBA] or the type of discourteous conduct that is sanctionable by the Standards of Conduct Policy." Additionally, the arbitrator discounted the student's credibility because some of the text messages contradicted the student's testimony from the Title IX hearing, and a few weeks before talking to Abu-Absi, the student had sought guidance from Pierson about a situation involving a different professor who asked her to find people to report a third professor for sexual harassment. He also found no merit to UT's argument that Pierson somehow delayed the student's graduation or forced her to take an independent study with him, and there was no "veiled sexual purpose in discussions from both [Pierson] and [the student] that their relationship would change after graduation . . . ."

{¶ 11} In short, despite expressing some reservations about a couple of things Pierson said to the student, the arbitrator concluded that "the totality of circumstances convincingly demonstrates that [Pierson] was not guilty of engaging in conduct of a sexual nature that he should have realized was unwelcome." However, the arbitrator found that the university had just cause to discipline Pierson for disclosing confidential information from the administration to the student, and the appropriate punishment was a 20-day, unpaid suspension.

6.

## D. Parties' trial court arguments

{¶ 12} UT filed an application in the trial court to vacate, modify, or correct the arbitrator's award. Its application asserted that the trial court should vacate the award for three reasons. First, the university argued that the court should vacate the award under R.C. 2711.10 because the arbitrator exceeded his authority by issuing an award that conflicts with and does not derive its essence from the CBA, and the award demonstrates evident partiality. Specifically, it claimed that the arbitrator went beyond the submitted issue (i.e., whether UT had just cause for terminating Pierson) by deciding that Pierson did not violate the university's Title IX policy, and the award conflicted with the CBA because the agreement "did not provide that an arbitrator could invalidate, revisit, or reverse any Title IX finding or determination made by the University." Further, UT found evident partiality on the face of the award because the arbitrator invalidated the university's Title IX findings, discounted the student's testimony at the predisciplinary hearing while using other information from the Title IX proceedings, and accepted Pierson's arbitration testimony as true despite his lack of credibility and contradictory statements.

{¶ 13} Next, UT argued that the arbitrator's award violated "well established, dominant public policy" because reinstating a professor who had direct contact with college- and high school-aged students and had "demonstrated offensive and harassing, [sic] grooming, lack of professional boundaries, or other unprofessional tendencies to cross lines with a female student" went against federal and state public policies

7.

"prohibiting sexual harassment and permitting school employers to exercise managerial authority to protect its students by promoting a safe learning or working environment."

{¶ 14} Finally, the university argued that the arbitrator decided an issue that the parties did not submit for arbitration when he determined that Pierson did not violate Title IX because he was not asked to determine whether Pierson violated Title IX until Pierson included that request in his post-hearing brief. Instead, the arbitrator was limited by the CBA and the parties' agreement on the issues to determining whether there was just cause for Pierson's firing. In doing so, he was required to "accept the findings and decision of the Title IX investigation as final." Because he did not, he exceeded his authority, which prevented UT from "taking appropriate remedial measures to protect students and community members regarding the history of Pierson's prior incidents or from taking disciplinary action against Pierson in the future based on his conduct."

{¶ 15} AAUP and Pierson filed a memorandum in opposition to UT's application to vacate and their own application to confirm the arbitrator's award. In their application, they argued that the trial court should confirm the arbitration award because UT's Title IX findings were "encompassed in the just cause disciplinary grievance" (i.e., one of the bases for terminating Pierson's employment was misconduct in violation of the Title IX policy) and were submitted to arbitration under the terms of the university's Title IX policy and CBA. They also pointed out that R.C. 2711.09 requires a trial court to confirm the award unless the court vacates, modifies, or corrects the award under R.C. 2711.10 or 2711.11.

8.

{¶ 16} In their response to UT's application, AAUP and Pierson first argued that the trial court was only able to review the face of the arbitration award to determine if any of the conditions in R.C. 2711.10 or 2711.11 for vacating, modifying, or correcting exist. They contended that there was no evidence that the arbitrator was partial or biased, the arbitrator's choice to believe one witness over another was not evidence of partiality, and the very limited nature of a court's review of an arbitration award prevented the trial court from substituting its own judgment for the arbitrator's by determining witness credibility.

{¶ 17} Next, they argued that the arbitrator did not exceed his authority because the award drew its essence from the CBA, was rationally supported by the CBA, and did not conflict with the express terms of the CBA. Specifically, the university's Title IX policy provides for arbitration under the CBA as a faculty member's means of appealing a Title IX determination; an arbitrator's just cause inquiry allows him to determine both whether just cause for discipline exists and whether the amount of discipline was proper; and the arbitrator's decision was not arbitrary or capricious.

{¶ 18} Third, AAUP and Pierson argued that (1) the trial court could not properly vacate the arbitration award because public policy was not one of the "narrow categories" of permissible bases in R.C. 2711.10 for vacating an arbitration award, and this is not a case where the narrow exception of vacating an award as against public policy applies; (2) UT's arguments about the award violating public policy assume that the arbitrator found that Pierson violated Title IX but reinstated him anyway, which was not the case; (3) there is no public policy about reinstating the employment of a professor who was

9.

charged with a Title IX violation, but found not guilty of that violation; and (4) public policy did not support giving a university "unbridled authority to terminate its employees for their alleged misconduct."

{¶ 19} Finally, AAUP and Pierson argued that the trial court could not modify or correct the arbitrator's award under R.C. 2711.11 because the parties submitted the issue of whether Pierson violated Title IX to the arbitrator. They claimed that the plain language of the CBA and Title IX permitted arbitration of a Title IX determination, and UT did not object to testimony and evidence related to the Title IX investigation during the arbitration hearing, or generally object to the arbitrator considering the Title IX proceedings when deciding whether just cause existed for Pierson's termination, which implicitly acknowledged the arbitrator's ability to consider the Title IX issue.

### E. Trial court's decision

{¶ 20} In its decision, the trial court granted UT's motion to vacate, modify, or correct and denied AAUP and Pierson's motion to confirm.

{¶ 21} After recapping the evidence presented at arbitration, the arbitrator's opinion and award, and the parties' arguments, the court found that the arbitrator's award was "heavily dependent" on his determination that Pierson had not engaged in sexual misconduct or sexual harassment as defined in UT's Title IX policy. The court found that, although the arbitrator generally determined that Pierson's conduct did not constitute sexual harassment under the Title IX policy, his opinion "largely ignore[d]" the fact that three of the disciplinary charges against Pierson were based on UT's standards of conduct policy and the "professional obligations" section of the CBA—not the Title IX policy—

10.

and these other policies did not preclude UT from disciplining an employee "for harassment or other inappropriate behavior, regardless if it is of a 'sexual nature' or not[,]" and neither the standards of conduct nor the CBA required that an employee's conduct be sexually-oriented before the university could impose discipline.

{¶ 22} The trial court pointedly noted that the arbitrator "expressly declined to draw the same inferences as UT had during its investigation, . . . ." "relied on his own opinion to determine what Pierson should have been responsible for realizing (or not) during his communications and interactions with the [student,]" disagreed with the credibility determinations the Title IX department made during its investigation, and "implicitly afforded credibility to the explanations and statements offered by Pierson during the investigation, while appearing to assign little, if any, credibility to the [student's] complaints and her statements regarding the unwelcome nature of Pierson's conduct." Regardless, the court recognized that "deference must be given to the arbitrator's decision, and [the court] must accept his factual findings for purposes of this review."

{¶ 23} The court went on to note that, although an arbitrator is able to interpret a CBA, apply a CBA, and construe ambiguous contract language, he does not have the authority to disregard or modify the plain language of a CBA. In this case, the parties' CBA "expressly provides that the Arbitrator has no authority to add to, subtract from, alter, change, or modify any of the provisions of the agreement; his decisions must be limited to only the question or questions submitted to him for decision; and he shall not

11.

render any decision which would result in the violation of the agreement or a public statute or regulation."

{¶ 24} The trial court concluded that the arbitrator exceeded his authority by adding to, subtracting from, altering, changing, or modifying any provision of the CBA.

{¶ 25} Regarding the first charge against Pierson—the Title IX violation—the trial court found that the arbitrator's "general determination" that Pierson's conduct did not violate the Title IX policy "largely ignores that three of the charges were in fact premised on violations of the Standards of Conduct Policy and/or Section 5.2.2 of the CBA . . . ."

{¶ 26} Regarding the second charge against Pierson, the court found that the arbitrator's determination that Pierson's conduct did not constitute sexual harassment as defined in UT's Title IX policy ignored the fact that he was charged with violating the CBA and UT's standards of conduct policy, which both allowed UT to discipline employees for "harassment and other inappropriate behavior, regardless if it is of a 'sexual nature' or not." Ultimately, the trial court concluded that the arbitrator erred by failing to determine that Pierson's conduct "was not 'inappropriate' or unprofessional . . . [,]" both of which were impermissible under the CBA and the standards of conduct policy.

{¶ 27} Regarding the third charge against Pierson, the trial court found that the arbitrator "conflated the conduct expressly prohibited by the Title IX Policy with the conduct discussed in the clear language of the CBA which, again, did not frame Pierson's obligations/prohibitions within a sexually-related context." By doing so, the arbitrator "inappropriately added to the CBA" because the CBA "does not expressly allow, or even

12.

relax, the employee's obligations/prohibitions in instances even where a student is either receptive to the employees inappropriate or unprofessional conduct, or the student initiates the same."

{¶ 28} Finally, regarding the fourth charge against Pierson, the court determined that the arbitrator made findings related to sexual harassment of the type that was prohibited by Title IX but did not find that Pierson's behavior "also did not constitute 'harassment' as that term is used in Section 5.2.2 of the CBA."

{¶ 29} Ultimately, the court concluded that the arbitrator "exceeded his authority by adding 'requirements' to UT's authority to set standards of conduct for its employees and, in this case, to discipline Pierson based on his proven conduct . . . ." because he "made no express findings that Pierson's conduct – any of it – was not unprofessional, inappropriate, that it was not pervasive, or that he otherwise failed to maintain reasonable boundaries with a student." Thus, the court concluded, "'[t]he Opinion and Award, on its face, establishes that UT otherwise 'proved' that Pierson engaged in the complained-of conduct."

{¶ 30} The court went on to say that "[e]ven accepting the Arbitrator's factual findings," the award did not draw its essence from the CBA, which gave UT the right to manage and discipline employees and "expressly govern[ed] the conduct of employees such as Pierson." It concluded that "[n]either the CBA nor UT's Standards of Conduct Policy include a discipline 'safety valve' that the Arbitrator's Opinion would suggest to relieve Pierson from his obligations as an employee in the face of an apparently 'receptive' student" and the intentions behind Pierson's "inarguably pervasive" conduct

13.

did not allow him "to avoid his obligations and/or prohibitions" in the CBA and standards of conduct policy.

{¶ 31} AAUP and Pierson now appeal, raising two assignments of error:

> A. Whether the Trial Court committed reversible error when it granted Applicant/Movant/Appellee's Motion and Application to Vacate, Modify, or Correct Arbitration Award; vacated the Arbitration Award; and entered Judgment in conformity therewith.

> B. Whether the Trial Court committed reversible error when it dismissed Respondents/Cross-Applicants/Movants/Appellants' [sic] Motion and Application to Confirm Arbitration Award Pursuant to O.R.C. §2711.09.

## II. Law and Analysis

### A. The parties' arguments

{¶ 32} In their brief, AAUP and Pierson make five arguments. First, they argue that the trial court erred by denying their motion to confirm and granting UT's motion to vacate or modify because the court weighed the evidence and considered the witnesses' credibility, essentially determined that the decision was against the weight of the evidence, and improperly substituted its judgment for the arbitrator's by finding that Pierson's behavior violated the CBA and UT's standards of conduct policy—which violates the deferential standard of a trial court's review of an arbitration award.

{¶ 33} Next, they argue that the trial court erred by finding that the arbitrator exceeded his authority because the arbitrator had broad authority to interpret the terms of the CBA, and his decision to use Title IX standards to do so was appropriate and within his authority. They also note that the arbitrator had the power to gauge credibility and weigh evidence, and doing so in his decision did not show that he exceeded his authority.

14.

{¶ 34} Third, AAUP and Pierson argue that the trial court erred by finding that the arbitration award does not draw its essence from the CBA and that the arbitrator modified or disregarded the plain language of the CBA. They contend that the arbitrator reasonably interpreted the undefined terms in the CBA; he did not modify or disregard the CBA's language in reaching his decision.

{¶ 35} Fourth, they argue that the trial court's decision "undermines the finality of arbitration awards, invites judicial overreach, and threatens Ohio's public policy favoring arbitration in employment and labor disputes." They point out that judicial review of arbitration awards is "extremely limited" by statute in order to "uphold the strong public policy favoring private settlement of grievances . . . ." (Internal quotation omitted.) Here, the trial court undermined the finality of the arbitration award by substituting its own interpretation of UT's policies for the arbitrator's.

{¶ 36} Finally, they argue that the trial court should not have vacated the arbitrator's decision without having a complete transcript of the arbitration proceedings, which UT did not file with its application to vacate, modify, or correct the award.

{¶ 37} In response, UT argues that the arbitrator exceeded his authority, and his award did not draw its essence from the CBA. There was no rational nexus between the arbitrator's decision and the CBA because he conflated language in the CBA with language in the Title IX policy and added Title IX-specific requirements to the CBA (e.g., by requiring that any harassment be sexual for it to constitute just cause). And there was no rational or good-faith reason for the arbitrator to add Title IX-specific definitions to the CBA or the standards of conduct policy, and he essentially rewrote the CBA by

15.

doing so. UT also argues that the "well-defined, dominant public policies that prohibit sexual harassment and sexual discrimination under State and federal laws" support vacating the award, and AAUP and Pierson did not raise in the trial court the issue of public policy favoring finality of arbitration awards, so they waived it on appeal.

{¶ 38} UT next argues that the trial court gave the arbitrator's award the proper deference during its review because there is no evidence that the trial court presumed that the award was invalid or irregular, and the portion of its decision that addresses the merits of the underlying arbitration was a summary of the arbitrator's factual findings—*not* its own separate review of the facts. The university also contends that the trial court did not substitute its judgment for the arbitrator's or reassess the witnesses' credibility because (1) its statements about the witnesses' credibility came from the arbitrator's award, and "pointing out how the arbitrator weighed the evidence [does not] suggest that the trial court reassessed the credibility of the witnesses"; (2) the court recognized that it was bound to accept the arbitrator's findings of fact; and (3) the court's use of the word "pervasive" to describe Pierson's behavior was accurate, and "[t]he trial court's objectively accurate word choice does not constitute a substitution of judgment for that of the arbitrator . . . ."

{¶ 39} The University additionally argues that we should affirm the trial court's denial of AAUP and Pierson's motion to confirm the arbitrator's award because they did not include any authority in their brief that suggests that the trial court committed reversible error by dismissing the motion to confirm, and R.C. 2711.09 recognizes that an

16.

arbitration award should not be confirmed if the trial court grants a motion to vacate, modify, or correct.

{¶ 40} Finally, UT argues that we should disregard AAUP and Pierson's argument about the lack of a full transcript of the arbitration proceedings because they did not assign that as error, did not raise the issue in the trial court and have waived it, and improperly attempted to get the entire transcript into the record by including it as an attachment to their brief. If we do consider this issue, AAUP and Pierson's arguments fail because R.C. Ch. 2711 does not require the filing of a complete arbitration transcript, the trial court had numerous exhibits and many direct quotes of testimony before it through the arbitrator's award and the parties' filings in the trial court, and AAUP and Pierson are attempting to relitigate facts that were already determined in arbitration by bringing up the issue of an incomplete transcript.

{¶ 41} In their reply, AAUP and Pierson contend that the arbitrator did not exceed his authority. His award did not conflict with the CBA because (1) the CBA included a progressive discipline policy and did not require termination as the only disciplinary outcome for an employee's violation of the CBA or the standards of conduct policy; (2) the arbitrator had the power—through his just cause determination—to consider AAUP's grievance, the amount of discipline that UT imposed, and how the Title IX investigation and findings played into that; (3) the CBA does not contain a term restricting an arbitrator's ability to modify a disciplinary action, which would be necessary to find that the arbitrator exceeded his authority by modifying Pierson's discipline; and (4) the arbitrator's decision was not arbitrary, capricious, or corrupt. Further, they argue that the

17.

arbitrator did not disregard any provisions of the CBA when he incorporated definitions from the Title IX policy to reach his just cause determination because "just cause" was not defined by the CBA, which allowed the arbitrator to look outside of the agreement for a definition. Finally, they point out that there was a rational and good faith basis for the arbitrator using the Title IX standards in reaching his decision, i.e., UT relied heavily on the Title IX policy and investigation to terminate Pierson's employment, so it was rational for the arbitrator to consider that policy in reaching his decision.

{¶ 42} Regarding their argument that the trial court substituted its own judgment for the arbitrator's and reassessed the witnesses' credibility, AAUP and Pierson claim that "the trial court admitted to analyzing the 'substantive merits' of the Award[,]" and it made its own findings that Pierson's behavior constituted harassment as defined in the CBA, and was unprofessional, inappropriate, and pervasive. They also explain that the arbitrator addressed each of the four charges against Pierson before arriving at his conclusion that a 20-day suspension without pay was the appropriate disciplinary action.

{¶ 43} Additionally, they also reassert that the trial court failed to give the appropriate deference to the arbitrator's award in reaching its decision and note that the trial court's correct recitation of the legal standard does not necessarily mean that it gave the award the appropriate amount of deference. In support, they point to the trial court's finding that the arbitrator failed to determine that Pierson's conduct did not constitute harassment under the CBA or was not unprofessional, inappropriate, pervasive, or a reasonable boundary with a student, and its express findings that Pierson's behavior was

18.

"pervasive" and the award established that UT "'proved' that Pierson engaged in the complained-of conduct."

{¶ 44} Regarding UT's public policy argument, AAUP and Pierson assert that the case UT relies on is distinguishable, and the public policy exception does not apply here.

{¶ 45} Finally, they point out that the arbitration award should have been approved under R.C. 2711.09 because none of the conditions in R.C. 2711.10 exist.

## B. Applicable contract and policy provisions

{¶ 46} The parties' dispute involves the following CBA and policy terms.

- <u>UT and tenured/tenure-track faculty collective bargaining agreement</u>

  **ARTICLE 5**

  **FACULTY RIGHTS AND RESPONSIBILITIES**

  . . .

  5.2 PROFESSIONAL OBLIGATIONS

  . . .

  5.2.2 As teachers, Members shall encourage the free pursuit of learning in their students. They shall hold before them the best scholarly and ethical standards of their discipline. Members shall demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Members shall make every reasonable effort to foster honest academic conduct and to ensure that their evaluations of students reflect each student's true merit. They shall respect the confidential nature of the relationship between professor and student. They shall avoid any exploitation, harassment, or discriminatory treatment of students. . . .

  . . .

  **ARTICLE 18**

  **CORRECTIVE ACTION**

18.l The Employer shall not impose discipline except for just cause. The employer subscribes to the principles of progressive discipline except in instances when summary action is called for. Any disciplinary action shall be predicated upon written charges.

. . .

18.4 . . . Discipline issued under this article can be grieved on substantive and procedural grounds at the external arbitration level pursuant to Article 20, section 20.6.

. . .

**ARTICLE 20**

**GRIEVANCES**

. . .

20.2 DEFINITIONS

20.2.1 . . . Unless specifically modified within this Agreement, all provisions of this Agreement are subject to this Grievance Procedure.

. . .

20.3.6 EXTERNAL BINDING ARBITRATION

20.3.6.1 UT-AAUP shall have the sole right to submit a grievance filed by the union or a Member to final and binding arbitration by an external arbitrator. . . .

. . .

20.4 REMEDIES

External arbitrators . . . shall be bound by the following:

20.4.1 They shall have no authority to add to, subtract from, alter, change or modify any of the provisions of this Agreement.

20.4.2 Their decisions shall be limited to only the question or questions submitted for their decision.

. . .

20.4.4 They shall not render any decision which would result in the violation of this Agreement or a public statute or regulation.

. . .

20.5 Any grievance not otherwise specifically limited by this Agreement can be heard on substantive or procedural grounds. . . .

20.6 Suspensions or dismissals may be appealed by UT-AAUP directly to external arbitration.

. . .

(Boldface and underlining in original.)

- Policy No. 3364-25-01: Standards of conduct

  (D) Procedure

  . . .

  (3) . . . The expectation is that all employees are held to the highest standards of conduct in all areas related to their employment.  Inappropriate conduct of any kind, including but not limited to, disruptive, discourteous, disrespectful, abusive behavior, . . .  or any other behavior deemed inappropriate will be subject to disciplinary action based on the circumstances of the situation[.]

- Policy No. 3364-50-01: Title IX policy

  **(A) Policy Statement**

  . . .

  The University of Toledo (''University'') is committed to educational and working environments that are free from sex discrimination (including sexual harassment, sexual assault), and retaliation due to sex discrimination. . . .

  . . .

  Sexual misconduct includes sex discrimination, sexual harassment, sexual violence, sexual assault, conduct that exploits another person in a sexual and non-consensual way (such as voyeurism and nonconsensual

recording), stalking, interpersonal relationship violence, and indecent exposure.

. . .

**(E) Definitions and Examples**

. . .

Sexual harassment: Sexual harassment is unwelcome conduct of a sexual nature.  It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. . . .  Sexual harassment can occur in one of two forms:

Hostile environment: Exists if the conduct is sufficiently serious (severe or pervasive) that it interferes with or limits a student's ability to participate in or benefit from the University's program or an employee's ability to perform their job.  The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical.

. . .

**(I) Sanctions and Remedies.**  The sanctions and remedies that may be imposed or available depend on the nature of the party's relationship to the University.

. . .

(2) Employees found responsible for sexual misconduct may be subject to discipline as explained in the applicable collective bargaining agreement, University policy, or state law.

. . .

**(J) Appeal Process.**  Both the complainant and respondent will be provided equitable appeal rights, consistent with applicable policy or collective bargaining agreements. . . .

. . .

For employees, the bases for appeal are set forth in the applicable collective bargaining agreement or policy.

(Boldface in original and footnote omitted in section (E)).

22.

## C. Standard of review

{¶ 47} When parties to a contract agree to arbitrate their disputes, they agree to accept the arbitrator's view of the facts and the meaning of their contract. *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627*, 91 Ohio St.3d 108, 110 (2001). Here, the parties agreed in Article 20 of the CBA that AAUP "shall have the sole right to submit a grievance filed by the union or a Member to final and binding arbitration by an external arbitrator" in the event that it was dissatisfied with the outcome of the internal reviews of the grievance. Additionally, UT states in its Title IX policy that employees may appeal the outcome of a Title IX case as "set forth in the applicable collective bargaining agreement or policy." In other words, UT and AAUP agreed to arbitrate their grievance-related disputes, which encompasses an agreement to accept the arbitrator's view of the facts of the case and the meaning of the CBA.

{¶ 48} Importantly, "[w]hen agreeing to arbitration, the parties agree to accept the arbitrator's award *even if* it results in a legally or factually inaccurate decision." (Emphasis added.) *Internatl. Assn. of Firefighters Local 92 v. Toledo*, 136 Ohio App.3d 56, 60-61 (6th Dist. 1999). Because of that, and because of the "strong public policy favoring private settlement of grievances," courts have a very limited ability to review an arbitrator's decision. *Lake Cty. Bd. of Mental Retardation & Dev. Disabilities v. Professional Assn. for Teaching of Mentally Retarded*, 71 Ohio St.3d 15, 17 (1994). Specifically, courts are limited to the review outlined in R.C. Ch. 2711. As such, the courts can "not sit to hear claims of factual or legal error by an arbitrator, . . ." *Southwest Ohio Regional Transit* at 110, and "even a grossly erroneous decision" may be binding in

23.

the absence of fraud. *Goodyear Tire & Rubber Co. v. Local Union No. 200, United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 42 Ohio St.2d 516, 522 (1975).

{¶ 49} Under R.C. Ch. 2711, a trial court's review of an arbitration award "'is narrow and it is limited.'" *Miller v. Gunckle*, 2002-Ohio-4932, ¶ 10, quoting *Warren Edn. Assn. v. Warren City Bd. of Edn.*, 18 Ohio St.3d 170, 173 (1985). "A trial court may not evaluate the actual merits of an award and must limit its review to determining whether the appealing party has established that the award is defective within the confines of R.C. Chapter 2711." (Internal quotation omitted.) *Norman v. Kellie Auto Sales, Inc.*, 2020-Ohio-4311, ¶ 32 (10th Dist.)

{¶ 50} The only bases for disturbing an arbitrator's award are found in R.C. 2711.10 and 2711.11. Under R.C. 2711.10, a trial court can vacate an arbitration award in four circumstances:

> (A) The award was procured by corruption, fraud, or undue means.

> (B) There was evident partiality or corruption on the part of the arbitrators, or any of them.

> (C) The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

> (D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Similarly, R.C. 2711.11 limits a trial court's ability to correct or modify an arbitration award to circumstances where:

24.

(A) There was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award;

(B) The arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;

(C) The award is imperfect in matter of form not affecting the merits of the controversy.

In all other cases, a trial court "shall grant" a party's motion to confirm an arbitration award and enter judgment on the award. R.C. 2711.09.

{¶ 51} On appeal, our review of the trial court's decision is similarly limited. We are required to accept findings of fact that are not clearly erroneous and review questions of law de novo. *Toledo Clinic, Inc. v. Felix*, 2024-Ohio-489, ¶ 26 (6th Dist.), citing *Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 2018-Ohio-1590, ¶ 2. Our review does not encompass the merits of the dispute presented to the arbitrator. *Id.* Instead, we are confined to determining, from the face of the trial court's order, whether any of the statutory grounds for disturbing the arbitrator's award in R.C. 2711.10 and 2711.11 exist. *Id.*; *Carothers v. Shumaker, Loop & Kendrick, LLP*, 2023-Ohio-1907, ¶ 17 (6th Dist.). In other words, our analysis is limited to "the face of the trial court's order to determine whether it erred as a matter of law." *Akron v. Akron Firefighters Assn.*, 2015-Ohio-994, ¶ 10 (9th Dist.).

{¶ 52} An arbitrator's award must be upheld—and a court's inquiry into vacating the award ends—if the award draws its essence from the parties' agreement and is not

arbitrary, capricious, or unlawful. *Fowler v. Menards, Inc.*, 2018-Ohio-4052, ¶ 22 (6th Dist.); *Carothers* at ¶ 22 (citing cases).

**D. The trial court erred by vacating the arbitration award.**

{¶ 53} In its decision, the trial court found that the arbitrator "exceeded his authority by adding 'requirements' to UT's authority to set standards of conduct for its employees and, in this case, to discipline Pierson based on his proven conduct . . ."— namely, the requirement that Pierson's conduct meet the definition of sexual harassment in the Title IX policy. Based on our review of the face of the trial court's order, we disagree.

{¶ 54} An arbitrator acts within his authority to craft an award "so long as the award 'draws its essence' from the contract – that is, 'when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful." *Cedar Fair, L.P. v Falfas*, 2014-Ohio-3943, ¶ 7 (6th Dist.), quoting *Mahoning Cty. Bd. of Mental Retardation and Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.*, 22 Ohio St.3d 80 (1986), paragraph one of the syllabus. When there is a good faith argument that an arbitrator's award is authorized by the contract that gives the arbitrator authority over a dispute, the award is within the arbitrator's power. *Id.* However, an award "'departs from the essence of'" a contract when it conflicts with the express terms of the contract, is without rational support or cannot be rationally derived from the terms of the agreement, or both. *Id.*, quoting *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emps. Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177 (1991), syllabus.

26.

{¶ 55} As long as the arbitrator acts within the scope of the contract, a reviewing court will not reverse, even if the arbitrator improperly determines the facts, misinterprets the contract itself, or fashions a remedy not explicitly mentioned in the contract. *Id.* at ¶ 6. Put another way, "'[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority' a court should not overturn the decision, even if 'convinced that he committed serious error.'" *Painesville City Local Schools Bd. of Edn. v. Ohio Assn. of Pub. School Emps.*, 2006-Ohio-3645, ¶ 37 (11th Dist.), quoting *United Paperworkers Internatl. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

{¶ 56} "'[I]f the arbitrator has *not* exceeded his or her powers, the award should not be vacated or modified, absent any of the other circumstances in R.C. 2711.10 and 2711.11 (such as corruption, fraud, misconduct, partiality, or material mistake).'" (Emphasis in original.) *Bd. of Trustees of Miami Twp. v. Fraternal Order of Police*, 81 Ohio St.3d 269, 273 (1998), quoting *Queen City Lodge No. 69, Fraternal Order of Police, Hamilton Cty., Ohio, Inc. v. Cincinnati*, 63 Ohio St.3d 403, 407 (1992). Whether the arbitrator exceeded his authority is a question of law. *Portage Cty. Educators' Assn.* at ¶ 25.

{¶ 57} In this case, there is a rational nexus between the CBA and the arbitrator's award. The CBA authorizes a grievant to elevate their complaint to arbitration and allows "*[a]ny* grievance not otherwise limited by" the CBA to be "heard on substantive or procedural grounds." (Emphasis added.) There are no limits on Title IX grievances in the CBA. The Title IX policy itself provides that the "bases for employee appeals are set

27.

forth in the applicable, collective bargaining agreement or policy[,]" and does not include any limitations on an arbitrator's authority when hearing a Title IX appeal. These provisions give an arbitrator broad authority to decide all employment-related grievances brought by the union on behalf of one of its members. In these circumstances, an arbitrator does not exceed his authority by issuing an award on an employment-related grievance. *See Toledo Clinic* at ¶ 34 ("we find the arbitrator, who was empowered to decide all issues and claims related to the employment contract, acted within the scope of the contract").

{¶ 58} The trial court took issue with the arbitrator's failure to make "express findings that Pierson's conduct – any of it – was not unprofessional, inappropriate, that it was not pervasive, or that he otherwise failed to maintain reasonable boundaries with a student." Based on that, it found that "[t]he Opinion and Award, on its face, establishes that UT otherwise 'proved' that Pierson engaged in the complained-of conduct." And from that, the court concluded that the arbitrator exceeded his authority. However, none of this goes to the issue of the arbitrator's authority. Instead, it speaks directly to the legal and factual correctness of the arbitrator's decision and award, which is something neither the trial court, nor this court, can review. *See Internatl. Assn. of Firefighters*, 136 Ohio App.3d at 60-61 (6th Dist.) ("When agreeing to arbitration, the parties agree to accept the arbitrator's award even if it results in a legally or factually inaccurate decision."); *Piqua v. Fraternal Order of Police*, 2009-Ohio-6591, ¶ 18 (2d Dist.) ("[I]n reviewing an arbitrator's award, the court must distinguish between an arbitrator's act in

28.

excess of his powers and an error merely in the way the arbitrator executed his powers. The former is grounds to vacate; the latter is not."). Ultimately,

> [t]he fact that the common pleas court may have arrived at a different conclusion than did the arbitrator is immaterial. The common pleas court does not balance the equities, weigh the evidence or assess the credibility of witnesses. . . . Instead, a common pleas court is bound by an arbitrator's factual findings and serves only as a mechanism to enforce the arbitrator's award.

*Motor Wheel Corp. v. Goodyear Tire & Rubber Co.*, 98 Ohio App.3d 45, 52 (8th Dist. 1994).

{¶ 59} Because the arbitrator had power under the CBA to decide all employment-related grievances, he did not exceed his authority by deciding that UT lacked just cause for disciplining Pierson based on the majority of the charges against him. Whether the arbitrator properly executed that power is an issue that the courts cannot review.

{¶ 60} We also find that the arbitrator's decision is not arbitrary, capricious, or unlawful. Nothing about the arbitrator's carefully considered, exacting, exhaustive opinion and award is arbitrary or capricious. And, although UT argues that reinstating Pierson "violate[d] well-defined, dominant public policies that prohibit sexual harassment and sexual discrimination under State and federal laws[,]" this case does not meet the requirements of that narrow exception to the rule that arbitration awards are final. "[V]acating an arbitration award pursuant to public policy is a narrow exception to the 'hands off' policy that courts employ in reviewing arbitration awards and 'does not otherwise sanction a broad judicial power to set aside arbitration awards as against public

29.

policy.'" *Southwest Ohio Regional Transit Auth.*, 91 Ohio St.3d at 112, quoting *United Paperworkers Internatl.*, 484 U.S. at 43.

{¶ 61} UT cites *Akron Metro. Hous. Auth. v. Local 2517, Am. Fedn. of State, Cty., & Mun. Emp., AFL-CIO*, 2005-Ohio-2965, ¶ 8 (9th Dist.)—a case that did not involve accusations of sexual harassment or sexual misconduct—to support its argument that we cannot uphold an arbitrator's decision that violates the well-defined public policy "prohibit[ing] sexual harassment and sexual discrimination under State and federal laws." While there is some case law that supports this general proposition, *see, e.g., Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627*, 131 Ohio App.3d 751 (1st Dist. 1998), citing *Stroehmann Bakeries, Inc. v. Local 776, Internatl. Bhd. of Teamsters*, 969 F.2d 1436 (3d Cir. 1992), when the arbitrator finds that the employee did *not* commit sexual harassment, reinstating the employee does not violate public policy. *Cleveland v. Cleveland Assn. of Rescue Emps.*, 2011-Ohio-4263, ¶ 26 (8th Dist.). That is precisely what happened here. Therefore, we find that the arbitrator's award does not violate public policy and is not otherwise unlawful.

{¶ 62} To summarize, there is a rational nexus between the arbitrator's award and the CBA, and the award is not arbitrary, capricious, violative of public policy, or otherwise unlawful, so the arbitrator did not exceed his authority by reinstating Pierson's employment with UT. This is where our inquiry into vacating the award must end. *Fowler*, 2018-Ohio-4052, at ¶ 22 (6th Dist.); *Carothers*, 2023-Ohio-1907, at ¶ 22 (6th Dist.). Therefore, the trial court erred when it vacated the arbitration award and denied

30.

AAUP and Pierson's motion to confirm the arbitration award. AAUP and Pierson's assignments of error are well-taken.

### III. Conclusion

{¶ 63} After carefully considering the trial court's decision, we find that the court erred by granting UT's motion to vacate the arbitration award and denying AAUP and Pierson's motion to confirm the award. Therefore, we reverse and vacate the trial court's September 3, 2024 decision and remand this matter to the trial court. On remand, the trial court shall confirm the arbitration award and enter judgment on the award as provided in R.C. 2711.09. UT is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed, vacated and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Christine E. Mayle, J.
_____
JUDGE

Gene A. Zmuda, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.