AKRON METROPOLITAN HOUSING AUTHORITY, Appellant,

v.

LOCAL 2517, AMERICAN FEDERATION OF STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, AFL–CIO, et al., Appellees.

[Cite as *Akron Metro. Hous. Auth. v. Local 2517, Am. Fedn. of State, Cty.,
& Mun. Emp., AFL–CIO,* 161 Ohio App.3d 594, 2005-Ohio-2965.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22365.

Decided June 15, 2005.

Vincent J. Tersign, and James P. Wilkins, for appellant.

Kimm A. Massengill–Bernardin, for appellees.

SLABY, Presiding Judge.

{¶ 1} Appellant, the Akron Metropolitan Housing Authority ("AMHA") appeals from the judgment of the Summit County Court of Common Pleas, denying its motion to vacate or modify an arbitration decision issued on May 20, 2003. We vacate the decision of the trial court and enter judgment on behalf of AMHA.

{¶ 2} William L. Singfield ("Grievant") was employed with AMHA from 1992 until he was suspended and eventually terminated in January 2002. At the time of his termination, Grievant was a member of Local 2517, American Federation of State, County, and Municipal Employees, AFL–CIO, and Ohio Council 8 (collectively referred to as appellees).

{¶ 3} Appellees filed two grievances contesting Grievant's suspension and then his termination. The two grievances were processed together in an arbitration proceeding. The arbitration hearing was conducted before arbitrator Thomas Coyne on March 26 and 27, 2003. Coyne determined that AMHA had wrongfully discharged Grievant, and he ordered AMHA to reinstate him with back pay, benefits, and allowances.

{¶ 4} On August 13, 2003, AMHA filed a motion to vacate or modify the arbitration award. Appellees filed a motion to dismiss and a motion to confirm the arbitration award on September 9, 2003. On October 8, 2004, the trial court denied appellant's motion to vacate and ordered judgment upon the arbitration award in favor of appellees. Appellant appealed, raising three assignments of error for our review.

## ASSIGNMENT OF ERROR I

The trial court erred in finding that the arbitrator's award reinstating the grievant did not violate the established public policy in favor of workplace safety.

{¶ 5} In its first assignment of error, AMHA argues that the trial court erred in confirming the arbitration award in favor of appellee. AMHA argues that the arbitrator's decision to reinstate Grievant despite substantial evidence of threatening and violent conduct, as well as an opinion from a licensed Ph.D. clinical psychologist that Grievant threatened safety, violates a strong public policy promoting workplace safety and the obligation of employers to take affirmative action to ensure a safe workplace for employees. We agree.

{¶ 6} A party may appeal a trial court's order that confirms, modifies, corrects, or vacates an arbitration award. *Warren Edn. Assn. v. Warren City Bd. of Edn.* (1985), 18 Ohio St.3d 170, 173–174, 18 OBR 225, 480 N.E.2d 456, quoting *Lockhart v. Am. Res. Ins. Co.* (1981), 2 Ohio App.3d 99, 101, 2 OBR 112, 440 N.E.2d 1210. An appellate court reviews the trial court's order to discern whether an error as a matter of law occurred. *Union Twp. Bd. of Trustees v. Fraternal Order of Police, Ohio Valley Lodge No. 112* (2001), 146 Ohio App.3d 456, 459, 766 N.E.2d 1027, citing *McFaul v. UAW Region 2* (1998), 130 Ohio App.3d 111, 115, 719 N.E.2d 632. We find that the trial court erred as a matter of law in holding that the reinstatement of Grievant did not violate public policy.

{¶ 7} The issue in this case is a question of law—namely, whether reinstating Grievant is a violation of explicit public policy. Thus, we review the trial court's judgment under a de novo standard of review. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. A de novo review requires an independent review of the trial court's decision without any deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

{¶ 8} Public policy is a question for resolution by the courts. *W.R. Grace & Co. v. Local Union 759, Internatl. Union of United Rubber* (1983), 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298. Courts are obligated to refrain from enforcing an arbitrator's interpretation of the contract if that interpretation

violates explicit public policy. Id. To serve as a basis for vacating an arbitration award, the public policy must be well defined, dominant, and able to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." Id., quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744. *Grace*, however, does not "otherwise sanction a broad judicial power to set aside arbitration awards as against public policy." *United Paperworkers Internatl. Union v. Misco, Inc.* (1987), 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286.

{¶ 9} Workplace safety is a well defined and dominant public policy based on federal, state, and common law. The Ohio Supreme Court has held:

> Ohio's public policy is clearly in keeping with the laudable objectives of the federal Occupational Safety and Health Act. The public policy of this state demands that employees be provided with a safe work environment and that unsafe working conditions be corrected. This conclusion is supported by a host of statutes and constitutional provisions favoring safety in the workplace. See, e.g., Sections 34 and 35, Article II of the Ohio Constitution; R.C. 4101.11 (duty of employer to protect employees and frequenters); R.C. 4101.12 (duty of employer to furnish safe place of employment); R.C. 4121.13 (safety and investigative duties of the Administrator of Workers' Compensation); R.C. 4121.17 (duty of the Bureau of Workers' Compensation to investigate petitions concerning unsafe employment or places of employment); R.C. 4121.47 (no employer shall violate a specific safety rule adopted by the Administrator of Workers' Compensation or an Act of the General Assembly to protect the lives, health and safety of employees); and R.C. 4121.48 (occupational safety loan program to reduce employment hazards and promote health, and safety of employees).

*Kulch v. Structural Fibers Inc.* (1997), 78 Ohio St.3d 134, 152–153, 677 N.E.2d 308.

{¶ 10} The trial court correctly found that there is a strong public policy favoring workplace safety and recognized that an employer has the responsibility to maintain a safe environment for its employees and frequenters. Further, the trial court stated, "A place of public housing, such as AMHA, would be in such a position to be diligent as to the safety of its residents, employees, and frequenters." The court, however, concluded in error that the arbitrator's decision reinstating the Grievant did not violate public policy in favor of workplace safety.

{¶ 11} Grievant was a maintenance worker at the AMHA. The facts leading up to Grievant's eventual termination began on August 8, 2001. On that date, Grievant's supervisor, Michael Reinhart, went to a vacant unit where Grievant was assigned to work. Grievant was outside on the balcony of the unit and refused to come inside to discuss his project with his supervisor. After repeated

requests by Reinhart for Grievant to come inside to talk about his work, Grievant entered the unit and turned up the volume of his personal radio. Reinhart told Grievant that he was not going to shout over the radio, and Reinhart unplugged it. Reinhart testified that Grievant became angry, moved within half an inch of Reinhart's face, and yelled at Reinhart that "[he'd] be sorry" if he touched his personal property again. Reinhart testified that Grievant was very angry. His eyes were enlarged, and Grievant was "just yelling at the top of his lungs at [him]." Reinhart stated that he was concerned for his personal safety at that moment and left the unit and called his supervisor, Allan Thomas. Thomas showed up and escorted Reinhart back to the unit that Grievant was in. Thomas told Grievant to go home that day. After Grievant had left, Thomas and Reinhart noticed that he had left his keys in the door. Upon inspection, they realized that Grievant had six master keys that would open the doors to many AMHA units on his key chain. AMHA security was notified and took the keys.

{¶ 12} The next day, the AMHA Human Resources Director, Christine Yuhasz, arranged a meeting with the Grievant to discuss his altercation with Reinhart and to discuss his possession of the six master keys. Prior to Yuhasz's meeting with Grievant, she had met with Reinhart, O'Leary, and Terry Meese. At that meeting, Reinhart stated that he was afraid of Grievant and that other employees had approached him after hearing of the altercation and told him to be careful because Grievant could be dangerous. Reinhart told the others at the meeting that Grievant had previously told him that Grievant had gone to a previous supervisor's house and had lain in the snow with a shotgun waiting for the supervisor to return. According to what Reinhart claims Grievant had told him, Grievant had been angry at the supervisor for disciplining him. By the time the supervisor had returned to his home, Grievant's hands were too cold from lying in the snow to pull the trigger.

{¶ 13} After learning of the altercation between Reinhart and Grievant, Spurlock, the union steward for Akron North and a maintenance employee for the company, approached Reinhart and told him that Grievant had told the union steward a similar story about a gun and going after a previous supervisor.

{¶ 14} Grievant then met with Yuhasz to discuss the altercation and his possession of the six master keys. Grievant admitted that he had had a disagreement with Reinhart, but he denied that he knew anything about the master keys. At the end of the meeting, Grievant was placed on paid administrative leave pending further investigation. Yuhasz told him that some sort of suspension would be involved and that he would have to attend anger-management training.

{¶ 15} On August 17, 2001, at Grievant's request, Yuhasz met with him again. At that meeting, she asked him about why he had told Reinhart about his lying in

the snow waiting to shoot a supervisor. Grievant did not deny telling the story to Reinhart, nor did he state that it never happened. Following further investigation, on August 21, 2001, Grievant was suspended for 30 days and ordered to undergo anger-management treatment. The suspension letter stated: "You are also required to seek assistance for anger management. * * * You will be required to provide proof of treatment in order to be permitted to return to work, and as a condition of employment."

{¶ 16} AMHA based its decision to suspend Grievant on the incidents that took place in August 2001. It also took into consideration Grievant's past behavior regarding the appropriateness of anger-management treatment. Testimony was introduced at the arbitration proceeding to show the purpose behind the request that Grievant undergo anger-management treatment. Martin, a public-housing manager for AMHA, testified that in May 1994, Grievant, who had been working on a floor, yelled at a tenant, "Get the hell off the floor." Martin testified that the tenant "just looked at him and then he started saying things to her like, 'Get your black ass off the floor, Bitch.' * * * [T]he tenant started sobbing and went out the door * * *." The tenant had her five-year-old son with her, and the boy said hello to Grievant. Grievant stated to the child: "Bastard, get away from me." Martin called to Grievant, who responded, "If he touches me again, I'm going to hit him." The boy then followed his mother out the door. Based on those verbal confrontations, Grievant had received a three-day suspension.

{¶ 17} In August 1995, Grievant was suspended for five days after he had engaged in a verbal altercation with a co-worker while they were on AMHA property painting a vacant unit. Grievant initially denied using profanity but then admitted that he had lied to the AMHA Human Resource Manager after a statement was produced from a tenant who was with a young child in the unit above who had both witnessed the whole incident. The tenant stated that profane language had been used.

{¶ 18} Also introduced were multiple performance evaluations in which Grievant had received poor scores: a rating of "weak" in the areas of "conduct and cooperation with supervision" and "conduction and cooperation with co-workers." Based on the above occurrences, AMHA felt that it was necessary for Grievant to undergo anger-management treatment and receive a return-to-work authorization before he would be reinstated.

{¶ 19} On September 17, 2001, Grievant saw counselor Sara Seeley at Summit Psychological Associates. After two meetings, neither of which provided any anger-management counseling, Seeley called the Human Resources Director at AMHA prepared, at that time, to offer a return-to-work authorization. Summit Psychological Associates changed its report after speaking to the Human Resources Director and learning of information that conflicted with Grievant's

earlier responses regarding his background and reasons for counseling. Seeley never stated that she accepted the information as true, but she stated that she felt she needed more information to see whether there was an increased risk. After the conversation with the Human Resources Director and two telephone conversations and a session with Grievant, Seeley determined that she should involve others in her office in the evaluation and treatment of Grievant. Subsequently, Dr. James Orlando and Dr. James Frye became involved in the evaluation of Grievant.

{¶ 20} After conducting psychological testing and meeting with Grievant in several counseling sessions, Dr. Frye, in a letter that he sent to AMHA stated, "[W]e believe that there continues to be a risk that his anger will lead to further, potentially explosive incidents." Dr. Frye stated, "I do not believe that he can safely return to work at this time." Dr. Orlando thereafter called Yuhasz to warn her that a significant amount of Grievant's anger was directed toward her. Dr. Orlando and Dr. Frye both testified that in reaching their diagnosis and professional opinions regarding Grievant's safety in the workplace, they relied upon their own psychological testing data, their own interactions with Grievant, and their prior training and experience.

{¶ 21} When Grievant did not receive a return-to-work authorization from Summit Psychological Associates, he terminated his counseling there and began counseling with a social worker at Jewish Family Service, to whom he was referred by his attorney. Despite numerous requests by both Grievant and his attorney, the social worker, a Ms. Williams, refused to provide a recommendation that Grievant return to work.

{¶ 22} While Grievant was on suspension, AMHA continued its investigation. Several other incidents were brought to AMHA's attention. John Morris, an AMHA union employee, reported that Grievant had told him that Grievant had gone to an AMHA supervisor's house with a gun because Grievant was mad that he had been suspended. Morris saw Grievant's wife a few days after hearing Grievant's story and asked her whether the story was true. She confirmed its veracity, stating that she "was so glad that he came home and didn't do anything."

{¶ 23} An AMHA supervisor reported that during a meeting, Grievant threatened another employee, telling the other employee that he would "just bust [him] in the jaw." Further, AMHA learned that two individuals had filed police reports against Grievant for threatening them. A few employees had requested AMHA to provide bulletproof vests if Grievant was permitted to return to work, and Reinhart and Spurlock, Grievant's union steward, stated that they would quit working with AMHA if they were required to work with Grievant again because they were concerned.

{¶ 24} Based on the above evidence, all of which was introduced at the arbitration hearing, we find that the trial court erred as a matter of law in finding that Grievant's reinstatement with AMHA did not violate public policy in favor of safety in the workplace. We find it significant, as did the court in *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (Sept. 28, 1994), 1st Dist. No. C–930423, 1994 WL 525543, that the arbitration award in this case was an unconditional reinstatement, not requiring any successful rehabilitative efforts for the Grievant's anger condition prior to his returning to work, despite the findings of the counselors and psychologists that stated that Grievant was not ready to return to work.

{¶ 25} AMHA has a duty to protect its workforce against danger posed by Grievant. It is the opinion of this court that Grievant is a danger not only to his co-workers and supervisors, but also to the thousands of residents living in the public-housing units operated by AMHA. The trial court's holding for Grievant, despite the psychologists' recommendations and his known propensity toward violent statements, is clearly a violation of explicit public policy in favor of workplace safety.

{¶ 26} We affirm appellant's first assignment of error, vacate the decision of the trial court, and enter judgment in favor of appellant.

## ASSIGNMENT OF ERROR II

The trial court erred in finding that the arbitrator did not engage in arbitral misconduct by making repeated volatile statements, chastising counsel, and engaging in ex parte communications with the parties and counsel.

## ASSIGNMENT OF ERROR III

The trial court erred in finding that the arbitrator's award drew its essence from the parties' collective bargaining agreement where the arbitrator manufactured due process requirements and relied upon alleged past practice not introduced by either party.

{¶ 27} Given this court's resolution of appellant's first assignment of error, the second and third assignments of error are rendered moot, and we decline to address them. See App.R. 12(A)(1)(c).

{¶ 28} Appellant's first assignment of error is sustained, and the second and third assignments of error are moot. The judgment of the Summit County Court of Common Pleas Court is vacated, and judgment is entered on behalf of appellant.

Judgment vacated.

WHITMORE and BATCHELDER, JJ., concur.