[Cite as *Univ. of Toledo v. Am. Assn. of Univ. Professors, Toledo Chapter*, 2026-Ohio-632.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

The University of Toledo

    Appellee

v.

American Association of University
Professors, Toledo Chapter, et al.

    Appellants

Court of Appeals No. {48}L-25-00148

Trial Court No. CI0202401401

**<ins>DECISION AND JUDGMENT</ins>**

Decided: February 24, 2026

* * * * *

Sarah K. Skow and David M. Smigelski, for appellee.

Jonathan J. Winters and J. Connor Dunn, for appellants.

* * * * *

{¶ 1} This is an appeal, under R.C. 2711.15, from a consolidated judgment by the Lucas County Court of Common Pleas which granted the motion to vacate arbitration award, under R.C. 2711.10(D), by movant/appellee The University of Toledo (hereafter, the "University" or "UT")[1] and which denied the motion to confirm arbitration award,

---

[1] Assigned case No. CI2024-01401.

under R.C. 2711.09, by respondents/cross-movants/appellants American Association of University Professors, Toledo Chapter (hereafter, the "AAUP"), and Erik Tyger.[2] For the reasons set forth below, this court reverses the trial court's consolidated judgment and reinstates and confirms the arbitrator's award.

## I. Background

{¶ 2} Between 2017 and 2019, the University employed Mr. Tyger, who previously had a 16-year career in the media field and seven years as a part-time college-level instructor, as a lecturer in the School of Communications teaching classes such as reporting, television production, media writing, journalism, and communication principles and practices. As a lecturer Mr. Tyger was subject to the Lecturers Unit collective bargaining agreement between the University and the AAUP in effect between July 1, 2018, and June 30, 2021.

{¶ 3} The University first terminated Mr. Tyger's employment on May 6, 2019, for unsatisfactory performance for failing to follow the established curriculum or an acceptable grading formula. Mr. Tyger grieved his termination through the AAUP under the collective bargaining agreement. The arbitrator in that matter decided on May 5, 2021, to reinstate Mr. Tyger's employment with the University effective on May 10, 2019. That arbitration decision is not before this court in this appeal.

---

[2] Assigned case No. CI2024-04343. On January 10, 2025, the trial court granted the University's motion to consolidate case No. CI2024-04343 into case No. CI2024-01404 and thereafter dismissed case No. CI2024-04343.

2.

{¶ 4} Mr. Tyger did not return to work for the University because of another, pending disciplinary action by the University. The University terminated Mr. Tyger's employment for a second time on July 19, 2019, which Mr. Tyger, again, disputed. The second termination followed a University-investigated Title IX/Sexual Misconduct Policy violation report dated April 12, 2019, of unwelcome sexual conduct by Mr. Tyger in May 2018, with a female student creating a hostile environment. Mr. Tyger was charged with two violations of sexual misconduct under the University's "Title IX" policy[3] and one violation of the University's "Standards of Conduct" policy.[4] After the other arbitrator's reinstatement decision on May 5, 2021, within five days, on May 10, Mr. Tyger grieved his second termination through the AAUP by submitting the grievance to external arbitration under Section 16.3.3 of the collective bargaining agreement.[5] On November

---

[3] "Title IX policy" and "sexual misconduct policy" are used interchangeably throughout the record. The University's sexual misconduct policy was originally effective on December 1, 2007, and was revised on August 9, 2018. The policy states that the University issued it to be consistent with the federal law requirements, among others, of Title IX of the Education Amendments of 1972, which prohibits sex discrimination. The policy states at Section (H)(3)(d)(ii), "No appeal of this decision [of a policy violation by a faculty or staff respondent] is allowed, except through processes in the individual's collective bargaining agreement."
[4] The University's "Standards of Conduct" policy was originally effective on January 1, 2008, and was revised on September 25, 2017. The policy states that the University issued it to promote its "goals of excellence." The policy states at Section (D)(3), "Inappropriate conduct of any kind . . . will be subject to disciplinary action based on the circumstances of the situation." The policy concludes, "Failure to follow university policies may result in discipline up to and including termination."
[5] Section 16.3.3.1 relevantly states, "UT-AAUP shall have the sole right to submit a grievance filed by the union or a Member to final and binding arbitration by an external arbitrator."

3.

10, 2023, the arbitrator for the second termination reinstated Mr. Tyger's employment and assessed a five-day disciplinary suspension effective on July 19, 2019.

{¶ 5} The parties timely filed cross-motions of the arbitrator's decision to the trial court under R.C. 2711.09 and 2711.10(D). On June 13, 2025, the trial court granted the University's motion to vacate the arbitration award and denied the AAUP's and Mr. Tyger's motion to confirm the arbitration award.

{¶ 6} The trial court found that Section 16.4.2 of the collective bargain agreement limited the arbitrator's decision to the questions submitted and that Section 16.4.1 prohibited the arbitrator from adding to, subtracting from, altering, changing, or modifying any provision in the collective bargaining agreement. The trial court determined that the two issues submitted to the arbitrator were whether Mr. Tyger's grievance to arbitration was timely submitted[6] and whether there was "just cause" for the University's termination of Mr. Tyger's employment.[7] The parties acknowledge that "just cause" is not defined in the collective bargaining agreement.

{¶ 7} The arbitrator determined for the first issue that Mr. Tyger's grievance was timely submitted.[8] Neither party raised that issue to the trial court, and the trial court did not address that issue.

---

[6] As stated in the arbitration award, "Whether the arbitration submission is timely."
[7] As stated in the arbitration award, "Whether the University had just cause to terminate Mr. Tyger."
[8] The arbitrator determined: "Mr. Tyger was [first] terminated for poor work performance and the termination decision was submitted to arbitration. When a decision was made to abrogate that termination decision, the University opted to pursue termination number 2

4.

{¶ 8} The arbitrator determined for the second issue that there was no "just cause" for Mr. Tyger's termination and, instead, awarded a five-day suspension. The arbitrator explained that the University denied Mr. Tyger due process by summarily terminating him, without satisfying the "seven primary steps before implementing disciplinary action." For example, the arbitrator found that Mr. Tyger's conduct did "not meet the test for the creation of a hostile work environment – unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." The trial court disagreed and found that "neither [the University's] Title IX investigations(s) – nor the outcome of such investigation(s) – were before the arbitrator[, who] must accept the University's determination that Mr. Tyger violated its Title IX policy." Consequently, the trial court found that since the arbitrator decided "a question/issue which was not before her, such award is outside the parties' contractual arrangements in the CBA [collective bargaining agreement] and must therefore be vacated."

{¶ 9} The trial court explained:

> To be sure, Section 15.1 of the CBA is clear: "The Employer shall not impose discipline except for just cause." Pursuant to these explicit terms of the CBA, just cause is required before any discipline may be imposed by UT; the CBA does not distinguish between a just cause standard for terminations but a different and/or lower threshold for lesser

on the basis of the Title IX investigation. The Title IX termination was then submitted to arbitration. Under the circumstances of this case, this Arbitrator cannot conclude that the arbitration submission for termination 2 was untimely because neither Mr. Tyger nor the AAUP had a reason nor an opportunity to act on termination 2 until a final decision on termination 1 had been rendered."

5.

disciplinary action. The explicit terms of the CBA impose a just cause standard on all disciplinary action, no matter how minor or severe. As the arbitrator analyzes the "just cause" standard, she notes "the employer [must] satisfy seven primary steps before implementing disciplinary action[.]" Those seven steps are: 1) Reasonable rule; 2) Notice; 3) Sufficient investigation; 4) Was the investigation fair; 5) Substantial proof; 6) Have the rules been evenly applied; and 7) Are there mitigating circumstances that warrant reduction of the penalty?

While the Court declines to restate the entirety of the arbitrator's analysis herein, its review of the decision indicates the arbitrator ultimately concluded the final four elements of the "just cause" standard were not met. As a result of this conclusion, Section 15.1 of the CBA mandates that no disciplinary action whatsoever may be imposed by UT on Mr. Tyger. Nevertheless, the arbitrator concluded "[t]he Grievant . . . shall be assessed a 5-day disciplinary suspension effective July 19, 2019."

{¶ 10} The trial court concluded the arbitrator violated R.C. 2711.10(D) and vacated the arbitration award because the award failed to draw its essence from the collective bargaining agreement where, "if the arbitrator determined there was no just cause for termination, then there was similarly no just cause for a disciplinary suspension pursuant to Section 15.1 of the CBA."

{¶ 11} The trial court further concluded that:

Because the University's determination that Mr. Tyger violated its Title IX policy was not before the arbitrator, such determination may not be disturbed pursuant to Section 16.4.2 of the CBA. As a result, the Court must conclude that Mr. Tyger violated UT's Title IX policy. Because of this determination, the Court also agrees with the University that it would violate clearly established public policy for the arbitrator to order UT to reinstate a professor who was determined to violate its Title IX policy against sexual harassment of a student. For this additional reason, the Court finds the arbitrator's award must be vacated.

6.

{¶ 12} Mr. Tyger and the AAUP timely appealed the trial court's consolidated judgment to this court and set forth three assignments of error:

1. The trial court erred in vacating the arbitrator's award on the grounds that the arbitrator exceeded her authority.

2. The trial court erred when it determined that the Title IX policy violations were not before the arbitrator.

3. The trial court erred in failing to confirm the arbitration award.

## II. Standard of Review

{¶ 13} R.C. Chapter 2711 governs arbitrations and the methods to challenge an arbitration award. *Warren Educ. Ass'n v. Warren City Bd. of Educ.*, 18 Ohio St.3d 170, 173 (1985). "An appeal may be taken from an order confirming, modifying, correcting, or vacating an award made in an arbitration proceeding or from judgment entered upon an award." R.C. 2711.15. Our R.C. 2711.15 review is confined to the trial court's order and neither includes a de novo review of the original arbitration proceedings nor of the merits of the dispute that led to the arbitration award. *Warren Educ. Ass'n* at 173-74; *Internatl. Assn. of Heat & Frost Insulator & Asbestos Workers, Local Union No. 45 v. Quality Insulation, Inc.*, 2008-Ohio-2982, ¶ 9 (6th Dist.). Simply put, the way the arbitrator executed her powers, i.e., "the legal and factual correctness of the arbitrator's decision and award[,] . . . is something neither the trial court, nor this court, can review." *Univ. of Toledo v. Am. Assn. of Univ. Professors*, 2025-Ohio-3008, ¶ 58 (6th Dist.).

{¶ 14} The entire purpose of the underlying arbitration proceeding between the University and Mr. Tyger/AAUP is that the parties contractually agreed under the

7.

collective bargaining agreement for the AAUP's right to submit Mr. Tyger's grievance to an external arbitrator, and in so doing, they agreed to accept the arbitrator's view of the facts and the meaning of the contract between them. *Id.* at ¶ 47, citing *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627*, 91 Ohio St.3d 108, 110 (2001). "'When agreeing to arbitration, the parties agree to accept the arbitrator's award even if it results in a legally or factually inaccurate decision.'" (Citations omitted.) *Toledo Clinic, Inc. v. Felix*, 2024-Ohio-489, ¶ 24 (6th Dist.). The parties do not forgo the substantive rights of their disputes in arbitration, but they trade the procedures and review of a judicial forum for the simplicity, informality and expediency of an arbitral forum. *Carothers v. Shumaker, Loop & Kendrick, LLP*, 2023-Ohio-1907, ¶ 9 (6th Dist.).

{¶ 15} "'The only way to give effect to the purposes of the arbitration system of conflict resolution is to give lasting effect to the decisions rendered by an arbitrator whenever that is possible.'" *Id.* at ¶ 10, quoting *Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 52 Ohio St.3d 174, 176 (1990). When parties agree to submit a dispute to arbitration, the arbitrator's decision must be final and binding whether or not the parties agree with the decision, except for those specifically stated in R.C. Chapter 2711. *Id.* at ¶ 10-11.

8.

## III. Analysis

{¶ 16} This court and the trial court have different roles when reviewing an arbitration award.

{¶ 17} The trial court shall vacate an arbitration award if, "'[t]he arbitrators exceeded their powers[.]'" *Fowler v. Menards, Inc.*, 2018-Ohio-4052, ¶ 14 (6th Dist.), quoting R.C. 2711.10(D).[9] "The trial court's decision cannot include a reconsideration of the merits of an award, even when parties allege that the award rests on errors of fact or on misinterpretation of the collective bargaining agreement." *Erie Cnty. Sheriff v. Fraternal Order of Police*, 2000 WL 1867935, *2 (6th Dist. Dec. 22, 2000). "'The fact that the common pleas court may have arrived at a different conclusion than did the arbitrator is immaterial. The common pleas court does not balance the equities, weigh the evidence or assess the credibility of witnesses. Instead, a common pleas court is bound by an arbitrator's factual findings and serves only as a mechanism to enforce the arbitrator's award.'" (Citations omitted.) *Univ. of Toledo*, 2025-Ohio-3008, at ¶ 58 (6th Dist.), quoting *Motor Wheel Corp. v. Goodyear Tire & Rubber Co.*, 98 Ohio App.3d 45, 52 (8th Dist.1994).

---

[9] "In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if: . . . (D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may direct a rehearing by the arbitrators."

9.

{¶ 18} In turn, our appellate review of the trial court's grant of the University's application to vacate the arbitration award is limited to determining the existence of the statutory grounds for the trial court's decision, i.e., whether under R.C. 2711.10(D) the arbitrator exceeded her powers. *Carothers*, 2023-Ohio-1907, at ¶ 14 (6th Dist.). Whether the arbitrator exceeded her authority is a question of law, which we review de novo. *Portage Cty. Bd. of Developmental Disabilities*, 2018-Ohio-1590, ¶ 25; *Univ. of Toledo* at ¶ 51.

{¶ 19} As previously stated, our de novo review of the existence of statutory grounds under R.C. 2711.10(D), is not a de novo review of the merits of the dispute as presented to the arbitrator. Rather, our review is whether the arbitration award fails to draw its essence from the collective bargaining agreement, where such essence is described as "'a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful.'" *Carothers* at ¶ 22, quoting *Cedar Fair, L.P. v. Falfas*, 2014-Ohio-3943, ¶ 7. If the arbitration award draws its essence from the collective bargaining agreement, the inquiry to vacate the award ends, and the arbitrator's award must be upheld. *Id.*; *Univ. of Toledo* at ¶ 62.

{¶ 20} Appellants argue three assignments of error to compel this court to reverse the trial court's consolidated judgment, to reinstate the arbitrator's award, and to confirm it.

{¶ 21} In support of their first assignment of error, appellants argue the trial court erred under R.C. 2711.10(D), when it concluded the five-day suspension "without just

10.

cause" did not draw its essence from the collective bargaining agreement. They argue the trial court erroneously substituted its judgment when it determined that since the arbitrator did not find "just cause" for Mr. Tyger's termination, she also found no "just cause" for imposing any discipline of any kind, including the five-day suspension. Rather, they argue that since the arbitrator did not fully absolve Mr. Tyger of guilt, the five-day suspension drew its essence from the collective bargaining agreement. In addition they argue, "If the University truly believed that it was error for the arbitrator to review the Title IX decision, it needed to do something other than continuously invite the arbitrator to review the Title IX decision." Citing *Fostoria v. Ohio Patrolmen's Benevolent Assn.*, 2005-Ohio-4558, ¶ 13-14, appellants argue the invited error doctrine applies to the University's constant framing of the termination issue before the arbitrator in terms of the Title IX policy and investigation, yet insisting that the arbitrator was prohibited from reviewing the Title IX policy and investigation. Appellants argue the University cannot have it both ways.

{¶ 22} In response the University argues the trial court did not err because it should not merely rubber-stamp the arbitration award. The trial court "properly reviewed the plain language of the CBA and the plain language of the limited just cause determination that was presented to the Arbitrator and the Arbitrator's opinion and analysis." And the arbitrator exceeded her authority when she "applied an unauthorized 'substantial proof' burden of proof and disregarded that the Title IX policy . . . required a preponderance of the evidence standard applied to such complaints."

11.

**{¶ 23}** The University further argues, generally citing *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Employees Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177 (1991), the arbitrator "exceeded her authority and the limits of the agreed-upon issues for the arbitration . . . by deciding questions related to the University's process and determination regarding its Title IX/Sexual Misconduct Policy . . . which the University did not submit to be arbitrated." The University asserts that since the AAUP grievance of May 10, 2021, did not challenge the Title IX policy itself, and only challenged the "just cause" for Mr. Tyger's termination under that policy, then the trial court properly found the arbitrator exceeded her authority when she invalidated the Title IX investigation process.

**{¶ 24}** Similarly, the University argues the arbitration award "is devoid of any such discussion, reasoning, or analysis of just cause contained about [the] Standards of Conduct policy or in the reduced disciplinary suspension." However, the University acknowledged, "Notably, the Arbitrator's findings did not absolve Tyger of engaging in unwelcomed conduct of a sexual nature towards the female undergraduate student," which we infer arises from the arbitrator's statement, "These acknowledgements [statements and admissions by Mr. Tyger in the record], to be sure, represent poor judgement on Mr. Tyger's part, and a violation of the University's Standards of Conduct policy." Nevertheless, citing *Fraternal Order of Police v. Dayton*, 2025-Ohio-2539, ¶ 22-24 (2d Dist.), the University concludes that that this court must affirm the trial court's decision "where an arbitration award conflicts with a provision of a CBA, the award

12.

departs from the essence of the CBA, lacks a rational to the CBA, and cannot be confirmed."

{¶ 25} In support of their second assignment of error, Mr. Tyger and the AAUP argue the trial court erred when it determined the arbitrator's award violated the Title IX policy by incorrectly concluding that the University's Title IX investigation and determination was not a question presented to the arbitrator. They argue that the just-cause question submitted to the arbitrator necessarily included evaluation of the underlying policy violations, including the Title IX policy. Citing *Summit Cty. Children Servs. Bd. v. Communication Workers of Am., Local 4546*, 2007-Ohio-1949, ¶ 19, appellants argue that where it is undisputed that "just cause" is not defined by the collective bargaining agreement, then the parties left it to the arbitrator, not the trial court, to define "just cause," and she did not exceed her authority doing so. We agree. *Hiss v. Perkins Local School Dist. Bd. of Education*, 2019-Ohio-3703, ¶ 152 (6th Dist.), citing *Summit Cty.* at ¶ 19 ("it was reasonable for the arbitrator to look to the Daughtery test to supply meaning for 'good cause' because it was undefined in the parties' CBA.").

{¶ 26} Consequently, we agree with appellants that the arbitrator was free to use a seven-part test to determine "just cause" under the collective bargaining agreement:

> Here, the arbitrator used a version of the "Daughtery test" for just cause. The same test the Supreme Court approved to determine just cause in *Summit County*, and one the University used in its own brief. This test required the arbitrator to review the Title IX decision in determining whether there is just cause for discipline, just as the University reviewed the Title IX decision when it applied virtually the same test in its post arbitration brief.

13.

In applying her steps for just cause, the arbitrator picked a definition of just cause explicitly recognized as a valid interpretation when it is not defined in the CBA and one that comports with the well-recognized judicial principle that, a just cause determination requires an arbitrator to (1) determine whether a cause for discipline exists and (2) whether the amount of discipline was proper under the circumstances. [Citation omitted.]

{¶ 27} Further, appellants argue that under the University's own Title IX policy, where the completed Title IX investigation warranted discipline, "the disciplinary policies and procedures in the Collective Bargaining Agreement will be followed" in compliance with *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). In addition they argue, "appeals of Title IX decisions may only be made through the process in the Collective Bargaining Agreement, i.e., the grievance procedure."

{¶ 28} The University responds that the trial court properly employed a de novo standard of review for the question-of-law of whether Mr. Tyger's reinstatement by the arbitrator violated public policy, citing *City of Ironton v. Rist*, 2010-Ohio-5292, ¶ 16 (4th Dist.), citing also *Akron Metro. Hous. Auth. v. Local 2517, Am. Fedn. of State, Cty., & Mun. Emp., AFL-CIO*, 2005-Ohio-2965, ¶ 7 (9th Dist.). The University argues the trial court properly found that the University's Title IX policy was not reviewable by the arbitrator, and the arbitrator "needed to accept the University's determination that Tyger violated the University's Title IX policy and could not disturb that determination per Section 16.4.2 of the CBA," especially "where the University's investigators and hearing officer specifically trained on Title IX did find Tyger had violated Title IX." The University also argues the trial court properly found that Ohio and federal law have long-

14.

standing public policies against sexual harassment and sexual discrimination towards students.

{¶ 29} The University further responds that Mr. Tyger and the AAUP "do not dispute the remedial nature of Title IX and the obligations that educational institutions like the University have related to Title IX." The University concludes, "Throughout this litigation, Respondents have not disputed that public policy prohibits sexual harassment. . . . Notably, the Arbitrator's findings did not absolve Tyger of engaging in unwelcomed conduct of a sexual nature towards the female undergraduate student. The Award's reinstatement of Tyger was properly vacated for violating established public policy against sexual harassment, and because the Arbitrator exceeded her authority in violation of R.C. 2711.10(D). The vacatur should be affirmed."

{¶ 30} In support of their third assignment of error, appellants argue the corollary to their that first assignment of error: that R.C. 2711.09 compelled the trial court to confirm the arbitration award. They argue "[i]n the absence of a valid reason to vacate the award, the trial court was without choice but to confirm the arbitration award," citing *Lake Cty. Bd. of Mental Retardation & Dev. Disabilities v. Professional Assn. for Teaching of Mentally Retarded*, 71 Ohio St.3d 15, 17 (1994).

{¶ 31} R.C. 2711.09 states, "At any time within one year after an award in an arbitration proceeding is made, any party to the arbitration may apply to the court of common pleas for an order confirming the award. Thereupon the court shall grant such an order and enter judgment thereon, unless the award is vacated, modified, or corrected as

15.

prescribed in [R.C. 2711.10 and 2711.11]." The timeliness of appellants' motion to confirm is not in dispute.

{¶ 32} We agree that arbitration is the preferred and favored means of resolving disputes between labor and management, "'and every reasonable intendment will be indulged to give effect to such proceedings and to favor the regularity and integrity of the arbitrator's acts.'" *Id.*, quoting *Bd. of Educ. of the Findlay City School Dist. v. Findlay Educ. Ass'n*, 49 Ohio St.3d 129, 131 (1990), *overruled on other grounds*. We also agree that the trial court's authority under R.C. 2711.10(D) is limited, which favors confirming the arbitration award under R.C. 2711.09:

> Accordingly, this court has placed certain restrictions on a reviewing court's authority to vacate an arbitrator's award pursuant to R.C. 2711.10(D), because the integrity and purpose of the arbitration system of dispute resolution would be seriously undermined in the absence of such restrictions. . . . Therefore, given the presumed validity of an arbitrator's award, a reviewing court's inquiry into whether the arbitrator exceeded his authority within the meaning of R.C. 2711.10(D), is limited. Once it is determined that the arbitrator's award draws its essence from the collective bargaining agreement and is not unlawful, arbitrary or capricious, a reviewing court's inquiry for purposes of vacating an arbitrator's award pursuant to R.C. 2711.10(D) is at an end.

*Bd. of Educ. of the Findlay City School Dist.* at 131-33.

{¶ 33} The University responds by reiterating its arguments supporting the trial court's decision to vacate the arbitration award under R.C. 2711.10(D), which then warranted denying appellants' R.C. 2711.09 motion to confirm. The University argues, "Respondents fail to cite any authority that would suggest that the trial court committed reversible error by dismissing their Cross-Motion to Confirm." The University

16.

distinguished *Lake Cty.* by arguing it "did not involve any issue or even include any discussion about R.C. 2711.09 or a motion to confirm." While the University is correct that the Ohio Supreme Court was addressing R.C. 2711.11(C) in *Lake Cty.*, the Court determined that, "Although *Findlay* dealt with reviewing a court's authority under R.C. 2711.10, its reasoning applies with equal force here. The premise of *Findlay* is that an arbitrator's award which draws its essence from the collective bargaining agreement and which is not unlawful, arbitrary or capricious will be upheld." *Lake Cty. Bd. of Mental Retardation & Dev.*, at 19, citing *Bd. of Educ. of the Findlay City School Dist.* at 132. In turn, when the *Lake Cty.* court determined the trial court lacked authority in that case to modify the arbitration award, R.C. 2711.09 is implicated because that statute unambiguously states that the arbitration award shall be confirmed, "unless the award is vacated, modified, or corrected as prescribed in [R.C. 2711.10 and 2711.11]." In any event, *Lake Cty.* is not determinative in this matter.

{¶ 34} Upon de novo review, we find the trial court erred when it determined under R.C. 2711.10(D) that the arbitrator exceeded her authority because of incorrect factual and legal determinations of "just cause" for Mr. Tyger's discipline, for incorrect interpretations of the collective bargaining agreement when fashioning a corrective action, and for violating public policy by reinstating Mr. Tyger after the University determined he violated the University's Title IX policy. We find the trial court improperly reviewed the way the arbitrator executed her powers by substituting that analysis to find the arbitrator exceeded her authority under the collective bargaining

17.

agreement. *Univ. of Toledo*, 2025-Ohio-3008, at ¶ 59 (6th Dist.). It is immaterial that the trial court arrived at different conclusions of fact and of law than the arbitrator. *Hillsboro*, 52 Ohio St.3d 174, at syllabus ("the arbitrator's interpretation of the contract, and not the interpretation of a reviewing court, governs the rights of the parties"). Our appellate review does not disturb any arbitrator error misinterpreting the facts or the law, and appellee does not argue fraud or arbitrator dishonesty as the basis for us to reverse the arbitration award. *Carothers*, 2023-Ohio-1907, at ¶ 46 (6th Dist.).

{¶ 35} As discussed below, the arbitrator's award was within her authority under the collective bargaining agreement, and the trial court's duty was to enforce the arbitration award by denying appellee's application/motion to vacate that award under R.C. 2711.10(D) and by granting appellants' application/motion to confirm the arbitration award under R.C. 2711.09.

{¶ 36} First, under Sections 16.3.3.1 and 16.6[10] of the collective bargaining agreement, the arbitrator's jurisdiction to decide Mr. Tyger's grievance was triggered by the AAUP's decision on May 10, 2021 to submit Mr. Tyger's grievance to the external arbitrator.

{¶ 37} Second, Section 16.4 of the collective bargaining agreement specifies the scope of the remedies in an arbitration award. The arbitrator's award in this matter is within such scope under Section 16.4.2. for the question, "Whether the University had

---

[10] "Suspensions or dismissals may be appealed by UT-AAUP directly to external arbitration."

18.

just cause to terminate Mr. Tyger." Section 16.4.2 states for arbitrators, "Their decisions shall be limited to only the question or questions submitted for their decision." Here, the arbitrator ultimately decided on the just-cause-for-termination question that while there was no just cause from the University's Title IX investigation to warrant terminating Mr. Tyger, he should receive a five-day suspension.

{¶ 38} In reaching her award, the arbitrator had the authority to interpret the collective bargaining agreement, including Sections 16.4.2 and 15.1. Section 15.1 states, "The Employer shall not impose discipline except for just cause. The employer subscribes to the principles of progressive discipline except in instances when summary action is called for. Any disciplinary action shall be predicated upon written charges." In turn, the three-step progressive discipline process of reprimand, suspension, and dismissal/termination, is outlined in Section 15.4:

> Reprimands may be issued to a Member by the Member's College Dean, the Provost, or the President. Suspension of Members may only be issued by the President, or designee. Dismissal of Members for cause may only be implemented by a formal written Notice of Dismissal, together with reasons therefore and a bill of particulars, issued by the President. Discipline issued under this article can be grieved on substantive and procedural grounds at the external arbitration level.

{¶ 39} Obviously, the arbitrator interpreted the just-cause-for-termination question differently from the trial court because the arbitrator reviewed both the University's Title IX policy and the University's Title IX investigation of Mr. Tyger when fashioning her arbitration award. This court previously reviewed the University's identical Title IX policy as in this matter when we held, "[t]he Title IX policy itself provides that the 'bases

19.

for employee appeals are set forth in the applicable, collective bargaining agreement or policy[,]' and does not include any limitations on an arbitrator's authority when hearing a Title IX appeal." *Univ. of Toledo*, 2025-Ohio-3008, at ¶ 57 (6th Dist.). We also find no limitation in the collective bargaining agreement before us for Title IX grievances. *See id.*

{¶ 40} Regardless of whether we agree with the arbitrator's conclusions, we find it was impossible for the trial court to find that the underlying Title IX investigation by the University against Mr. Tyger was not properly before the arbitrator. The Title IX investigation was the basis for the University's decision to discipline Mr. Tyger. When the University made that decision, it chose to not follow the progressive disciplinary process explicitly stated in the corrective action section of the collective bargaining agreement. Instead, the University chose to go directly to the final corrective action of terminating Mr. Tyger.

{¶ 41} Again, "just cause" is not defined in the collective bargaining agreement in this matter.

{¶ 42} Even if we accept, which we do not, the trial court's determination "that the arbitrator -- and therefore the Court -- must accept the University's determination that Mr. Tyger violated its Title IX policy," the question presented to the arbitrator under Section 16.4.2 remained whether that foregoing just-cause determination leading to Mr. Tyger's immediate termination was the only corrective action for that just-cause determination under the collective bargaining agreement. The arbitrator determined

20.

another corrective action, a five-day suspension, was appropriate.[11] Suspension is unambiguously contemplated by the collective bargaining agreement.

{¶ 43} Here, the arbitrator employed a seven-part, just-cause analysis because, "The just cause standard in a negotiated agreement requires the employer to satisfy seven primary steps before implementing disciplinary action." The arbitrator concluded her just-cause analysis by determining the appropriate corrective action against Mr. Tyger was a five-day suspension. Although the trial court declined to restate the arbitrator's reasoning in its decision, the trial court's disagreement with the following reasoning for how the arbitrator executed her authority was not a valid basis to vacate the award.

> 1. Reasonable Rule. The employer is required to have promulgated a reasonable rule or policy that is applicable to the particular misconduct being alleged. In this case, Mr. Tyger was charged with violation of the University's Sexual Misconduct policy, as well as violation of the University's Standards of Conduct policy.
> 2. Notice. To be applicable to the grievant, s/he must be on notice of the rule or policy. Here, Mr. Tyger has not alleged that he was unaware of the University's policies.
> 3. Sufficient Investigation. Before a final decision is made, the employer is required to make a reasonable effort to obtain all facts and evidence that may support or refute the allegations. Two Title IX complaints were filed on behalf of [the complainant] . . . The initial complaint was dismissed when [the complainant] declined to participate with the investigation. The second complaint led to the ultimate decision to terminate Mr. Tyger's employment. Without question, the University made every effort to interview all direct and indirect witnesses to the incidents alleged. Both [the complainant] and Mr. Tyger were interviewed, allowed to review their statements, and allowed to correct and/or supplement their

---

[11] The arbitrator determined: "As noted above, there is nothing on the record that would support a finding that Mr. Tyger's conduct warranted immediate termination of employment rather than a progressive, corrective disciplinary action similar to that given to other faculty members similarly situated."

21.

statements. Both staff members who filed the Title IX complaints were interviewed. Students who were in the same class as [the complainant] and/or who had recent interactions with Mr. Tyger were interviewed.

4. Was the Investigation Fair. As part of the just cause standard, it was not sufficient for the University to simply conduct an investigation. Rather, the University was required to ensure that the due process rights of the accused had been protected. Due process requires that the employee (or the accused) be afforded the opportunity to present his/her side of the case in a meaningful way. *See, Matthews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L.Ed. 18 (1976)(emphasis added). In a case involving an allegation made by one individual against another, the "right to present his side of the case" necessarily includes the right to question the accuser and other witnesses. *See, Doe v. Baum,* 903 F. 3rd 575 (6th Cir. 2018). Simply put, context is everything. How a statement reads on paper or how a witness presents when they are permitted to provide an unfettered recitation of events, might be completely different when those statements are challenged and the specifics of how, when or where events occurred are explored. Here, Mr. Tyger was not provided with the opportunity to question witnesses or to challenge their credibility, both of which are essential to presenting his side of the case in a meaningful way. The Arbitrator is cognizant of the University's obligation to shield [the complainant] from contact with Mr. Tyger in light of the allegations made and [the complainant's] desire to avoid contact. Nevertheless, arrangements could have been made to both protect [the complainant] and ensure Mr. Tyger's due process. [The complainant] (or any of the other witnesses) could have appeared via video conference, giving Mr. Tyger's representatives the opportunity for cross examination and providing the hearing officer the opportunity to judge the credibility of each witness. The failure to provide this opportunity deprived Mr. Tyger of due process. Moreover, the Arbitrator has concerns about the scope of the investigation It is alleged that [the complainant] provided inconsistent statements regarding the events of May 2, but there is nothing on the record to indicate that the University addressed this issue. Mr. Tyger alleged that [the complainant] also placed her head on his shoulder briefly, but again, there is nothing on the record to indicate that the University addressed this interaction. Mr. Tyger further alleged that [the complainant] raised a concern about her grade and whether he could waive her absences to improve her grade, and his belief that her subsequent allegations stemmed from his refusal to grant her request. However, there is nothing on the record to indicate that the University investigated or addressed this issue. An investigation cannot be deemed to be fair and complete if the process denies due process to one

22.

party and fails to consider all relevant facts regarding the parties interactions.

5. Substantial proof. Whether there is substantial proof that Mr. Tyger violated the University's policies raises another question – what proof or evidence are we to consider? Numerous witnesses were interviewed, but not one of them had first hand knowledge to support or refute the specific allegations raised by [the complainant]. This, in and of itself, is not unusual as there are typically no witnesses to incidents involving allegations of sexual misconduct or harassment. According to the statements, some of the witnesses agreed that (a) Mr. Tyger asked students to share their telephone numbers to allow him to communicate via "group me" chats; (b) Mr. Tyger communicated with students via social media; and (c) Mr. Tyger made personal comments about his marriage during class discussions. However, none of the witnesses supported the allegation that Mr. Tyger made negative comments about the "Me Too" movement or that women who had been sexually harassed were "asking for it". Several witnesses indicated that [the complainant] spoke favorably about Mr. Tyger and the course during the final days of the class. And at least one of the witnesses indicated that [the complainant] left a message on Mr. Tyger's classroom whiteboard stating that she "luv dis class -- ur fav". This message was purportedly left on May 2, 2018, the same date as the alleged incident in Title IX complaint filed on behalf of [the complainant]. To be clear, the Arbitrator has not made – and is not making -- a determination on the veracity of [the complainant's] complaint or concerns. All of the allegations made are significant and should be taken seriously. However, in light of the due process violations identified above, the only evidence that should be relied upon is Mr. Tyger's statements and admissions: (a) that he discussed personal attributes about his marriage during class; (b) that he touched the top of [the complainant's] head for 2-3 seconds to "jump start her brain"; (c) that he leaned forward and rested his head on her shoulder, inhaled, and asked her what perfume she was wearing because he wanted to buy some for his wife; ( d) that he commented that another student looked "like a model" in a Facebook photograph; (e) that he asked [the complainant] for her work schedule (for the purpose of inviting her to his wife's surprise birthday party); (f) and that he invited [the complainant] to meet for lunch sometime during the summer (because she and his parents were from the same community and he frequented there often). These acknowledgements, to be sure, represent poor judgement on Mr. Tyger's

part, and a violation of the University's Standards of Conduct policy.[12] It is a stretch -- although not an illogical leap, to conclude that Mr. Tyger's touching -- laying his head on [the complainant's] shoulder and smelling her perfume -- could be viewed as offensive and sexual in nature. Mr. Tyger was charged with violating the University's Sexual Harassment policy by creating a hostile work environment. However, conduct that is possibly offensive - and definitely unwise -- does not meet the test for the creation of a hostile work environment -- *unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity.* Accordingly, charging Mr. Tyger with creating a hostile work environment in violation of the University's Sexual Misconduct policy, without providing him with an opportunity to present his case in a meaningful way -- by cross examining witnesses, challenging credibility, and providing context for the interactions -- was an overreach. If as Dr. Bjorkman indicated, we "view only the facts as reported by Mr. Tyger", we simply can't get to the creation of a hostile work environment from here. *See,* July 2, 2019 Pre-Disciplinary Determination. [Emphasis sic.]

      6. Have the rules been evenly applied. No evidence was presented by the University on this issue during its case-in-chief. However, Donald Wedding, UT-AAUP Vice President and Grievance Officer, presented Union Exhibit 27, a report of prior incidents involving faculty members who purportedly made unwise decisions -- either conduct or statements -- that did or could have involved students. . . . This Arbitrator cannot speak to the particular details of any of these incidents as they are not before me. However, on its face, and without evidence to the contrary, there is at least an inference that allegations against Mr. Tyger were treated more harshly than equally (or more) serious allegations against other faculty members.

      7. Are there mitigating circumstances that warrant reduction of the penalty. Mr. Tyger served as a lecturer with the University for 2 years. No evidence was presented that would support a conclusion that his performance was less than satisfactory prior to the events which led to termination 1 and termination 2. As noted above, there is nothing on the record that would support a finding that Mr. Tyger's conduct warranted immediate termination of employment rather than a progressive, corrective

---

[12] We infer this is why the University acknowledged, "Notably, the Arbitrator's findings did not absolve Tyger of engaging in unwelcomed conduct of a sexual nature towards the female undergraduate student."

24.

disciplinary action similar to that given to other faculty members similarly situated.

{¶ 44} Finally, we find the arbitration award did not violate public policy. The University made an identical argument in a prior matter as it does here: that reinstating Mr. Tyger violated well-defined public policy that prohibits sexual discrimination and sexual harassment, such as the Title IX policy. As before, we find that the University failed to show that the public policy exception, which is narrow and not broad, was warranted in this matter to overrule a court's hands-off policy when reviewing arbitration awards and to undercut their finality. *Univ. of Toledo*, 2025-Ohio-3008, at ¶ 60 (6th Dist.), citing *Southwest Ohio Regional Transit Auth.*, 91 Ohio St.3d at 112 (2001).

{¶ 45} The University's reliance is misplaced on *Akron Metro. Hous. Auth.*, 2005-Ohio-2965, at ¶ 8 (9th Dist.) to support its argument that the arbitrator's award cannot be confirmed where it violates well-defined public policy prohibiting sexual harassment and sexual discrimination. The *Akron Metro* court was addressing workplace safety policies and regulations to comply with the federal Occupational Safety and Health Act and various state statutes relating to workplace safety, such as those related to the Bureau of Workers' Compensation. *Id.* at ¶ 9. Those policies are distinguishable from the sexual misconduct policies underlying the arbitration in this matter. *Carothers*, 2023-Ohio-1907, at ¶ 29 (6th Dist.).

{¶ 46} "However, we agree with [the *Akron Metro*] court's recognition of the absence of a broad judicial power to use alleged public policy violations to set aside

25.

arbitration awards." *Id.* at ¶ 30, citing *Akron Metro* at ¶ 8. "The Ohio Supreme Court guides us that vacating an arbitration award pursuant to public policy must be approached with caution and only where the public policy is well-defined and dominant by reference to laws and legal precedents and not to general considerations of supposed public interests." *Id.*, citing *Southwest Ohio Regional Transit Auth.* at 112. "The foregoing caution identifies a narrow exception to a court's 'hands off' policy in reviewing arbitration awards and does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy." *Id.* Contrary to the University's argument, the public-policy exception cannot be used to review the merits of the arbitration award before us. *Id.*, citing *Cleveland v. Cleveland Police Patrolmen's Assn.*, 2016-Ohio-702, ¶ 44 (8th Dist.) (it is not the respondent's conduct that must be shown to have violated the public policy but rather the arbitrator's decision to reinstate the respondent). We find that neither the collective bargaining agreement, nor the University's Title IX policy statement that discipline is pursuant the collective bargaining agreement for such policy violations, mandate the arbitrator was prohibited from reinstating Mr. Tyger with a five-day suspension.

{¶ 47} We find that as a matter of law, the arbitrator ruled upon the question submitted. The arbitrator's award determining a different corrective action drew its essence from the collective bargaining agreement because there is a rational nexus to it, and the award is not arbitrary, capricious or unlawful. We hereby order the reinstatement of the arbitrator's award and confirm it under R.C. 2711.09.

26.

**{¶ 48}** Appellants' first, second and third assignments of error are found well-taken.

## IV. Conclusion

**{¶ 49}** On consideration whereof, the consolidated judgment of the Lucas County Court of Common Pleas is reversed, and we reinstate and confirm the arbitrator's award. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J. _____

_____
JUDGE

Christine E. Mayle, J. _____

Gene A. Zmuda, J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.